John E. Flaherty
Ravin R. Patel
MCCARTER & ENGLISH, LLP
100 Mulberry Street
Four Gateway Center
Newark, NJ 07102
Tel: (973) 639-7903
Fax: (973) 297-3971

James A. Plemmons  (P42892)
Jason P. Klingensmith (P61687)
Patrick B. Green (P68759)
DICKINSON WRIGHT PLLC
500 Woodard Ave., Suite 4000
Detroit, MI  48226
Tel: 313-223-3500

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON CONTROLS, INC., a corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. _____ ) |
| SHIRLEY SOOY, formerly known as SHIRLEY RAUL, an individual, and TRANSVANTAGE SOLUTIONS, INC., formerly known as FTS INDUSTRIES, INC., a corporation, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## **COMPLAINT**

Plaintiff Johnson Controls, Inc. ("Plaintiff" or "JCI"), states as follows for its Complaint

against Defendants Shirley Sooy, formerly known as Shirley Raul ("Sooy") and TransVantage

Solutions, Inc., formerly known as FTS Industries, Inc. ("TransVantage") (collectively "Defendants"):

## PARTIES, JURISDICTION, AND VENUE

1. JCI is a corporation organized under the laws of the State of Wisconsin, and its principal place of business is located at 5757 N. Green Bay Avenue, Milwaukee, WI 53209.

2. Upon information and belief, Defendant Sooy, an individual, is a domiciled-resident of the State of New Jersey.

3. Upon information and belief, Defendant TransVantage is a corporation organized under the laws of the State of New Jersey, and its principal place of business is located at 58 Chambers Brook Rd, Branchburg, NJ 08876.

4. The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum or value of $75,000.

5. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties in this matter are diverse and the amount in controversy exceeds $75,000.

6. Venue in this action is properly laid in this Court pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**A. The Parties**

7. Plaintiff JCI is an automotive supplier that sells various parts, components and assemblies to the automotive industry. To that end, JCI contracts with logistics providers to provide freight, trucking, and delivery services to JCI. Due to the number of invoices and fees involved with these services, JCI contracts with other entities to audit the invoices for accuracy and appropriateness and to facilitate the timely payment of said invoices.

8. Defendant TransVantage is part of a trio of operations designated as the "TransVantage Group," which provides nationwide freight-related services of the type described

in the preceding paragraph. In addition to Defendant TransVantage Solutions, Inc., which provides freight auditing and payment services, the TransVantage Group also includes TransVantage Transportation, Inc., which provides motor carrier services, and TransVantage Forwarding, Inc., which provides logistics services.

9. As part of Defendant TransVantage's freight auditing and payment services, TransVantage first reviews invoices from its clients' logistic providers for accuracy and then, once approved, facilitates payment of the invoices using funds received from its client. Specifically, in order to make these payments, the clients of TransVantage transfer funds to TransVantage—such as through wire services—to be used solely and specifically for paying the reviewed and approved invoices.

10. Defendant Sooy is the owner and manager of the TransVantage Group, including the owner and manager of Defendant TransVantage. Sooy has acted in this capacity since at least 2003.

B. The Contractual Agreements

11. In the mid-1990s, JCI hired TransVantage to provide freight auditing and payment services for JCI's logistics providers, including its trucking and transportation entities.

12. JCI and TransVantage have continued this relationship for over two decades, codifying their arrangement in a series of Payment Services Agreements and/or Master Services Agreements (collectively, the "MSAs"). Pursuant to the MSAs, JCI would also issue Statements of Work (SOWs) to outline the specific elements of the parties' contractual obligations.

13. Per the agreements, TransVantage was contractually obligated to review invoices from JCI's logistics providers to ensure that the invoices were accurate and appropriately-billed to JCI. JCI would then wire money to TransVantage, and TransVantage was obligated to facilitate payment of those funds to the appropriate entities per the audited invoices.

TransVantage held these JCI funds in trust, constructive or otherwise, for the sole and limited purpose of paying the audited invoices of JCI's logistics providers.

14. The most recent written agreement between the parties was effective as of May 1, 2009. By its own terms, this agreement was set to expire two years after the effective date. However, the parties have voluntarily continued to operate under the terms of the agreement as though it had not expired.

15. Among other things, the agreement provides that it is to be construed in accordance with the laws of the State of Michigan.

16. Defendant Sooy, on behalf of TransVantage, is a signatory to the parties' most recent written agreement.

## C. Defendants' Misappropriation of JCI's Funds

17. During the first quarter of 2013, JCI was unexpectedly contacted by certain of its logistics providers and informed that the providers would no longer provide services to JCI because JCI had failed to pay its invoices.

18. JCI immediately contacted TransVantage and inquired as to the unpaid invoices. At that time, JCI learned that approximately $17 million of JCI's funds had not been delivered to its logistics providers by TransVantage.

19. JCI promptly took steps to transition its payment services away from TransVantage, and JCI hired Ernst & Young to examine TransVantage's records to assist with the transition.

20. During that on-site examination by Ernst & Young, Defendant Sooy admitted to several Ernst & Young employees that a multi-million dollar shortfall or "hole" existed at TransVantage at the time JCI began utilizing TransVantage's services. Sooy further stated that Defendants utilized funds provided by JCI (for the sole purpose of paying its freight providers)

to fill the "hole." Sooy also admitted to the existence of the hole, and TransVantage's efforts to fill the hole, during both a March 4, 2013 conversation with a JCI employee and during a March 28, 2013 meeting at TransVantage's offices, in which several individuals—including JCI representatives—were in attendance.

21. Accordingly, at the time JCI began doing business with TransVantage, the "hole" already existed. Despite this, TransVantage failed to inform JCI of the deficit in its client fund account, choosing instead to use JCI's first payments (which, at the time, totaled several million dollars per week) in an attempt to cover the "hole" and avoid discovery. These efforts to conceal were undertaken without JCI's knowledge or consent and in direct contravention of both TransVantage's representations and the express terms of the parties' agreements.

22. In the intervening years, TransVantage continued to both conceal the deficit and, due to additional fraud and mismanagement of client funds, increase the size of the deficit.

23. For example, in addition to the above misappropriation of funds, TransVantage also provided a loan(s) (of at least $1 million) to third-parties using JCI's funds, and the principal of the loan(s) has not been recovered. Similarly, TransVantage also invested, and lost, approximately $4 million of JCI's funds in the stock market—likely in an attempt to gamble current funds in the hopes of repairing the deficit.

24. Defendant Sooy admitted to the above conduct during her communications with Ernst & Young investigators, and Sooy expressly admitted that she's been aware of the deficit in the client account for years.

25. To ensure continued client funding and avoid detection, however, Sooy, on behalf of TransVantage, engaged in efforts to conceal the deficit in the client funds by utilizing accounting methods that would "float" the deficit between clients.

26. Notably, these "float" methods made concealment of TransVantage's fraudulent conduct possible, in part, because TransVantage did not segregate its various clients' funds into separate payment accounts. To the contrary, and despite the fact that TransVantage performed similar payment services for various other clients and received significant funds from these separate and distinct clients, TransVantage commingled its clients payment funds, forcing all funds to flow directly through TransVantage.

27. In fact, Sooy admitted during a meeting with JCI representatives that the shortfall at issue was effectively "tripped" only when JCI began requiring TransVantage to use a JCI-controlled account, rather than allowing all funds to flow through TransVantage. This segregation of funds interrupted the "float" that TransVantage had been using to conceal the fraudulent deficit.

28. Still, the active efforts by TransVantage and its agents to conceal the "hole" prevented JCI from learning of either the deficit or the improper allocation of its funds until the first quarter of 2013. At that time, JCI immediately began investigating TransVantage's conduct and, upon learning of the significant fraud at issue, timely brought suit to recover losses it has sustained as a result.

## COUNT I - BREACH OF CONTRACT
### (Against Defendant TransVantage)

29. Plaintiff restates and realleges the foregoing paragraphs as though fully-stated herein.

30. Since the inception of their relationship in the 1990's, JCI and TransVantage have operated under a series of written and implied agreements

31. Most recently, the parties entered into a written agreement in May 2009.

32. Though the agreement was scheduled to expire in May 2011, the parties have continued operating under the terms of the written agreement as though it did not expire.

33. The parties' written and implied-in-fact agreements constitute valid and enforceable contracts between JCI and TransVantage.

34. Under the parties' agreements, TransVantage promised to provide freight auditing and payment services for JCI, including facilitating the transfer of JCI's invoicing funds to JCI's logistics providers.

35. JCI has performed all of its material obligations under the parties' agreements.

36. TransVantage, however, has breached these agreements by, *inter alia*, (1) failing and/or refusing to properly audit and pay JCI's invoices; (2) threatening to prematurely and improperly discontinue service unless JCI accelerated payment of service fees; and (3) misallocating and/or misappropriating JCI's funds rather than transferring the designated funds to JCI's logistics providers.

37. As a result of TransVantage's fraudulent concealment of its improper conduct, JCI only learned of TransVantage's numerous breaches of contract—which have occurred since the beginning of the parties' relationship—in March 2013 after JCI's logistic providers notified JCI of TransVantage's failure to make payments.

38. JCI's investigation following the discovery of TransVantage's failure to make payments revealed systematic breaches of contract by TransVantage over the course of the parties' entire relationship—breaches that had been unlawfully and intentionally concealed by TransVantage and its agents.

39. TransVantage has failed and/or is unable to cure their breaches of the parties' agreements, and JCI has suffered significant damages as a direct and proximate result of TransVantage's breach of contract.

WHEREFORE, for all the reasons set forth herein, JCI respectfully requests that this Court enter judgment in its favor and against Defendant TransVantage in an amount not less than $75,000.00, together with interest, costs, and attorney fees, and any such other relief as the Court may deem just, equitable or appropriate in these circumstances.

## COUNT II - COMMON LAW AND STATUTORY CONVERSION
**(Against Defendant TransVantage and Defendant Sooy)**

40. Plaintiff restates and realleges the foregoing paragraphs as though fully-stated herein.

41. As part of JCI and TransVantage's contractual relationship, JCI regularly transferred funds to TransVantage for the sole purpose of TransVantage directing those funds to JCI's logistics providers.

42. These funds rightfully belonged to JCI, and TransVantage was duty-bound as JCI's paying-agent to tender payment of the funds to JCI's logistics providers.

43. Despite this, Defendant TransVantage and Defendant Sooy both knowingly and wrongfully converted JCI's invoicing funds by diverting JCI's funds to accounts and entities not approved by JCI. This improper diversion of JCI's funds constitutes wrongful conversion of JCI property and violates Michigan Compiled Laws ("MCL") 600.2919a and Michigan common law.

44. JCI has suffered damages as a direct and proximate result of Defendants' conversion of the invoicing funds.

45. Pursuant to MCL 600.2919a, JCI is entitled to treble damages, plus costs and attorney fees.

WHEREFORE, for all the reasons set forth herein, JCI respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, in an amount not less than $75,000.00, together with treble damages, interest, costs, and attorney fees, and any such other relief as the Court may deem just, equitable or appropriate in these circumstances.

### COUNT III - EMBEZZLEMENT
### (Against Defendant TransVantage)

46. Plaintiff restates and realleges the foregoing paragraphs as though fully-stated herein.

47. As part of JCI and TransVantage's arrangement, JCI regularly entrusted TransVantage with funds to be used for the payment of invoices owed to JCI's logistics providers.

48. These funds rightfully belonged to JCI, and TransVantage was duty-bound as JCI's paying-agent to tender payment of the funds to JCI's logistics providers.

49. TransVantage and JCI had a relationship of trust and confidence whereby JCI relied upon TransVantage to (1) provide accurate and truthful audits of its logistic providers' invoices and (2) issue payment as required under those audited invoices.

50. It was only pursuant to this relationship that JCI entrusted TransVantage with its invoicing funds.

51. Despite this, TransVantage wrongfully and intentionally converted JCI's invoicing funds to accounts and entities not approved by JCI, thereby unlawfully embezzling JCI's property.

52. This improper disposal and allocation of JCI's invoicing funds was done without JCI's knowledge or consent and in direct contravention of the parties' arrangement and relationship.

53. Defendants' wrongful embezzlement of the invoicing funds at issue violated MCL 750.174.

54. JCI has suffered damages as a direct and proximate result of Defendants' embezzlement of the invoicing funds.

WHEREFORE, for all the reasons set forth herein, JCI respectfully requests that this Court enter judgment in its favor and against Defendant TransVantage in an amount not less than $75,000.00, together with interest, costs, and attorney fees, and any such other relief as the Court may deem just, equitable or appropriate in these circumstances.

### COUNT IV - UNJUST ENRICHMENT/QUANTUM MERUIT
**(Against Defendant TransVantage and Defendant Sooy)**

55. Plaintiff restates and realleges the foregoing paragraphs as though fully-stated herein.

56. This claim is pled in the alternative only in the event that the Court finds that no enforceable contract exists or existed between the parties, or that the contracts that do/did exist do not provide a basis for JCI to recover all of its damages in this action.

57. By means of the wrongful conduct set forth above, Defendants have improperly retained an estimated $17 million of JCI's invoicing funds.

58. Defendants have failed to compensate JCI for the improper use and retention of those funds.

59. Defendants have, therefore, been unjustly enriched and have received a significant benefit that, in justice and in equity, they should not be entitled to retain.

60. To avoid inequity and injustice, the Court should enter judgment in JCI's favor and against Defendants for the full value of the benefits that Defendants have unjustly retained.

WHEREFORE, for all the reasons set forth herein, JCI respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, in an amount not less than $75,000.00, together with interest, costs, and attorney fees, and any such other relief as the Court may deem just, equitable or appropriate in these circumstances.

### COUNT V – CONSTRUCTIVE TRUST
### (Against Defendant TransVantage)

61. Plaintiff restates and realleges the foregoing paragraphs as though fully-stated herein.

62. As discussed throughout this Complaint, TransVantage engaged in illegal, fraudulent, and wrongful conduct in order to misappropriate, convert, and fraudulently obtain JCI's invoicing funds.

63. The funds that TransVantage misappropriated, converted, and otherwise fraudulently obtained rightfully belong to JCI.

64. It is unconscionable for TransVantage to retain the misappropriated funds, and TransVantage will remain unjustly enriched unless a constructive trust in favor of JCI is imposed on the misbegotten funds.

65. Upon information and belief, TransVantage holds the illegally received money in the form of bank accounts, real property, and/or personal property that can be located and traced.

66. Accordingly, a constructive trust is necessary to do equity and to prevent unjust enrichment.

WHEREFORE, JCI requests that this Court impose a constructive trust in favor of JCI for the funds improperly received and retained by TransVantage in an amount not less than

$75,000, together with interest, costs, and attorney fees, and grant any such other relief as the Court may deem just, equitable or appropriate in these circumstances.

### COUNT VI - FRAUD OR MISREPRESENTATION
**(Against Defendant TransVantage and Defendant Sooy)**

67. Plaintiff restates and realleges the foregoing paragraphs as though fully-stated herein.

68. Pursuant to the parties' two-decade long relationship, and as required under the parties' numerous written agreements, TransVantage promised to provide auditing and invoice-payment services to JCI.

69. However, TransVantage misrepresented its intention with regard to the receipt of JCI's invoicing funds as early as the 1990s, when the parties' relationship first began. Rather than directing JCI's funds toward the payment of JCI's invoices, TransVantage intentionally misallocated JCI's funds to cover a "hole" in TransVantage's invoicing account—a deficit caused by TransVantage own management (or, more accurately, mismanagement) of its clients' funds.

70. At the time of contracting with JCI, TransVantage was aware of the "hole" in its client fund account, and TransVantage never intended to properly utilize JCI's invoicing funds to pay JCI's logistics providers. To the contrary, at the time of contract, TransVantage fully intended to divert, and did indeed divert, JCI's invoicing funds toward filling the deficit in TransVantage's client funds' account.

71. TransVantage made these misrepresentations to JCI in order to induce JCI into a contractual arrangement with TransVantage and to ensure JCI channeled its invoicing funds through TransVantage (as the paying agent).

72. Based on these misrepresentations, JCI did, in fact, enter into a relationship with TransVantage. Then, influenced by TransVantage's false statements that it was properly allocating funds to JCI's logistics providers, JCI engaged in a continuing relationship with TransVantage—involving the transfer of hundreds of millions of dollars—for over two decades.

73. Specifically, following commencement of the parties' contractual relationship, TransVantage and Sooy systematically and consistently misrepresented the allocation JCI's invoicing funds, leading JCI to believe that its funds were being properly and appropriately paid to its logistics providers. To the contrary, however, TransVantage and Sooy were actually unlawfully diverting JCI's funds toward concealing a deficit caused by Sooy's and TransVantage's mismanagement of client funds.

74. In fact, TransVantage fraudulently concealed its unlawful embezzlement and conversion of JCI's funds for over twenty years through the use of "float" accounting methods and false-statements to JCI and its agents.

75. As a direct and proximate result of TransVantage's fraud and misrepresentations, JCI has suffered significant damages, both with regard to the lost invoicing funds and the damage to its reputation as a result of TransVantage's failure to pay JCI's logistics providers.

WHEREFORE, for all the reasons set forth herein, JCI respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, in an amount not less than $75,000.00, together with interest, costs, and attorney fees, and any such other relief as the Court may deem just, equitable or appropriate in these circumstances.

### COUNT VII - BREACH OF FIDUCIARY DUTY
**(Against Defendant TransVantage)**

76. Plaintiff restates and realleges the foregoing paragraphs as though fully-stated herein.

77. By contracting with TransVantage to act as its paying-agent, JCI reposed faith and trust in TransVantage that it would perform its duties in good faith and with loyalty to JCI.

78. To that end, TransVantage owed JCI fiduciary duties under Michigan law.

79. TransVantage breached its fiduciary duties by converting and embezzling JCI's invoicing funds and by fraudulently concealing the intentional misappropriation of the invoicing funds during the course of the parties' entire relationship.

80. To that end, TransVantage breached its fiduciary duties by neglecting its obligations to JCI and by acting in its own self-interest in fraudulently concealing the deficit in its clients' fund account. This conduct was in direct conflict with the interests of, and undertaken at the expense of, JCI.

81. JCI has been damaged as a direct and proximate result of TransVantage's breach of its fiduciary duties.

WHEREFORE, for all the reasons set forth herein, JCI respectfully requests that this Court enter judgment in its favor and against Defendant TransVantage in an amount not less than $75,000.00, together with interest, costs, and attorney fees, and any such other relief as the Court may deem just, equitable or appropriate in these circumstances.

### COUNT VIII - NEGLIGENCE
**(Against Defendant TransVantage)**

82. Plaintiff restates and realleges the foregoing paragraphs as though fully-stated herein.

83. TransVantage agreed to provide freight auditing and payment services as part of the parties' contractual agreements.

84. TransVantage owed JCI a duty to provide such services using the degree of care and skill ordinarily exercised under similar circumstances by competent members in both the freight auditing and invoicing professions.

85. As set forth above, TransVantage breached the duty it owed to JCI by failing to properly audit JCI's invoices and/or by failing to properly make payments pursuant to the parties' agreements.

86. JCI has suffered significant damages as a direct and proximate result of TransVantage's negligent breaches of its duty to perform those services with the degree of care and skill ordinarily exercised under similar circumstances by competent members in both the auditing and invoicing professions.

WHEREFORE, for all the reasons set forth herein, JCI respectfully requests that this Court enter judgment in its favor and against Defendant TransVantage in an amount not less than $75,000.00, together with interest, costs, and attorney fees, and any such other relief as the Court may deem just, equitable or appropriate in these circumstances.

### COUNT IX - FRAUDULENT CONCEALMENT MCL 600.5855
**(Against Defendant TransVantage and Defendant Sooy)**

87. Plaintiff restates and realleges the foregoing paragraphs as though fully-stated herein.

88. TransVantage and Sooy acted in concert to defraud JCI out of JCI's invoicing funds and to convert those invoicing funds for their own use and pecuniary gain.

89. In order to accomplish the goals of their conspiracy, TransVantage and Sooy concealed their unlawful conduct from JCI, by among other things: (1) misrepresenting to JCI that the amount of invoicing funds available for payment to JCI's logistics providers; (2) failing to inform and/or concealing the fraudulent diversion of JCI's invoicing funds; (3) concealing the

existence of the "hole" in TransVantage's client fund account; and (4) "floating" the deficit between clients to avoid detection.

90. JCI exercised due diligence in attempting to uncover and prevent this unlawful conduct and fraud by, among other things, segregating its invoicing funds from TransVantage's general client account, investigating the shortfall in JCI's invoicing funds immediately upon learning of TransVantage's failure to pay its logistics providers, and preparing to transition its invoicing services away from TransVantage immediately upon learning of the irregularities in the payment of its invoices.

91. However, notwithstanding JCI's efforts and reasonable diligence, TransVantage and Sooy were able to conceal their unlawful activities from JCI for over two decades by: (1) utilizing a "float" to delay JCI's recognition of the conversion of JCI's funds; and (2) affirmatively lying to JCI and its agents regarding the allocation of JCI's funds.

92. When JCI finally discovered and confirmed TransVantage's fraudulent conduct, JCI promptly undertook an internal investigation in March 2013 and initiated steps to transition its invoicing services away from TransVantage.

93. Following the investigation, and shortly after discovering Defendants' unlawful conduct, JCI promptly filed this lawsuit.

94. JCI has been damaged as a direct and proximate result of TransVantage's breach of its fiduciary duties.

WHEREFORE, for all the reasons set forth herein, JCI respectfully requests that this Court enter judgment in its favor and against Defendant TransVantage in an amount not less than $75,000.00, together with interest, costs, and attorney fees, and any such other relief as the Court may deem just, equitable or appropriate in these circumstances.

          Respectfully Submitted,

    By:  s/John E. Flaherty
          John E. Flaherty
          Ravin R. Patel
          MCCARTER & ENGLISH, LLP
          100 Mulberry Street
          Four Gateway Center
          Newark, NJ 07102
          Tel: (973) 639-7903
          Fax: (973) 297-3971

          James A. Plemmons  (P42892)
          Jason P. Klingensmith (P61687)
          Patrick B. Green (P68759)
          DICKINSON WRIGHT PLLC
          500 Woodard Ave., Suite 4000
          Detroit, MI  48226
          Tel: 313-223-3500

          *Attorneys for Plaintiff*

Date: April 8, 2013

## CERTIFICATION PURSUANT TO L.CIV.R. 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

By: s/John E. Flaherty
John E. Flaherty
Ravin R. Patel
MCCARTER & ENGLISH, LLP
100 Mulberry Street
Four Gateway Center
Newark, NJ 07102
Tel: (973) 639-7903
Fax: (973) 297-3971

James A. Plemmons  (P42892)
Jason P. Klingensmith (P61687)
Patrick B. Green (P68759)
DICKINSON WRIGHT PLLC
500 Woodard Ave., Suite 4000
Detroit, MI  48226
Tel: 313-223-3500

*Attorneys for Plaintiff*

Date: April 8, 2013